IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

| | | |
|---|---|---|
| PAUL STIGERS, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-126-GNS |
| | ) | JURY TRIAL DEMANDED |
| THE BOARD OF EDUCATION OF | ) | |
| WARREN COUNTY, CARLOS | ) | **PLAINTIFF'S VERIFIED** |
| JENKINS, and JAMES FRANCIS, | ) | **COMPLAINT** |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

* * * * * * * * * * * * *

Comes now the Plaintiff, Paul Stigers, by and through counsel, and for his Complaint against Defendants Carlos Jenkins, James Francis, and the Board of Education of Warren County, Kentucky, states as follows:

## PARTIES

1. Plaintiff Paul Stigers ("Plaintiff" or "Stigers") is, and at all times relevant hereto has been, a resident of Warren County, Kentucky, with his residence located at 993 Jackson Bridge Road, Bowling Green, Kentucky 42101. Stigers is currently employed by Warren County Public Schools ("WCPS") as a bus driver and driver trainer with the district's Department of Transportation ("DOT").

2. Defendant Board of Education of Warren County, Kentucky ("BOE" or the "Board"), is a body corporate and politic created and existing pursuant to KRS 160.160 for the express purposes of managing and controlling the WCPS school district. Accordingly, the BOE is the proper party-defendant for claims arising from unlawful acts committed by WCPS and its executives, officers, or agents. *See Nelson Cnty. Bd. of*

*Educ. v. Forte*, 337 S.W.3d 617, 625 (Ky. 2011). The BOE's principal office is located at 303 Lovers Lane, Bowling Green, Kentucky 42103.

3.    Defendant Carlos Jenkins ("Jenkins") is the current Director of the WCPS Department of Transportation ("DOT"). At all times relevant hereto, Jenkins is and has been a resident of Warren County, Kentucky, with his residence located at 901 Kristin Court, Bowling Green, Kentucky 42104. As Transportation Director, Jenkins is responsible for management of the entire department, with his duties including, *inter alia*, employee supervision, personnel decisions, and disciplinary matters.

4.    Defendant James Lee Francis ("Francis"), Ed.D., was employed by WCPS as the Director for the Human Resources ("HR") Department from approximately July 1, 2021 to June 30, 2023. At all times relevant hereto, Francis is and has been a resident of Warren County, Kentucky, with his residence located at 675 Constitution Drive, Bowling Green, Kentucky 42103. As HR Director, Francis was responsible for the management of the entire HR Department, with his duties including, *inter alia*, oversight of personnel policy development and enforcement, managing WCPS risk and compliance regarding state and federal employment laws, and implementing investigation and dispute resolution processes for employee complaints and grievances.

### JURISDICTION & VENUE

5.    Plaintiff's causes of action are brought pursuant to the Kentucky Civil Rights Act, KRS Chapter 344 ("KCRA"), the Kentucky Whistleblower Act, KRS 61.101–61.103 ("KWA"), and the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

6.  Jurisdiction over this action is conferred upon this Court pursuant to KRS 23A.010(1), KRS 61.103(2), KRS 344.450, 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 29 U.S.C. § 2617(a)(2).

7.  Venue in this action is proper pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

8.  Plaintiff is a veteran of the United States Navy with multiple medical conditions arising from his term of service, including persistent depressive disorder and degenerative disc disease ("DDD").

9.  Both of the aforementioned medical conditions substantially limit one or more of Plaintiff's major life activities. Plaintiff's persistent depressive disorder substantially limits his capacity for concentrating, thinking, and communicating, while Plaintiff's DDD substantially limits his capacity for standing, lifting, and walking.

10. As a result of Plaintiff's DDD, he qualifies for and possesses a disability-accessible parking placard and license pursuant to KRS 186.042 and KRS 189.456(1)(a), as his condition prevents him from walking two hundred feet without stopping for rest.

11. Plaintiff has been employed by WCPS as a bus driver with its Department of Transportation ("DOT") since November 2017. Beginning in July 2020, Plaintiff also became employed in the capacity of driver trainer, an as-needed position which provides intermittent training to current and newly hired DOT staff.

12. Since Fall 2020, Plaintiff has made several requests for reasonable accommodation of his disability to the DOT and the HR Department, but all of his requests have been arbitrarily and unlawfully denied.

13. Plaintiff has requested minor parking accommodations from the DOT on three occasions: once in Fall 2020, once in January 2023, and most recently on February

27, 2023. On each occasion, Plaintiff's request was necessitated by the DOT's decision to relocate its fleet to a distant area from staff parking, which required employees to undertake extensive treks to and from their buses multiple times each day. Due to Plaintiff's DDD, these increased walking demands caused him significant pain and mobility limitations in his legs and back. Accordingly, following each fleet relocation, Plaintiff requested from the DOT that he merely be permitted to park closer to his assigned bus to accommodate his disability.

14.  On each occasion Plaintiff requested minor parking accommodations, the DOT arbitrarily and unlawfully denied his requests. On two of these occasions—Fall 2020 and January 2023—the DOT subsequently granted the same parking request to other employees for reasons unrelated to any disabling condition.

15.  Plaintiff has also requested other reasonable accommodations during the course of his employment which the DOT also arbitrarily and unlawfully denied. In February 2023, Plaintiff was experiencing significant DDD-related pain as a result of sitting for prolonged periods in a bus model that was too cramped for him to stand fully upright when not driving. At his physician's recommendation, Plaintiff requested as a reasonable accommodation that he be reassigned to a bus model that would allow him to stand upright intermittently throughout the workday. Although the DOT has many such buses available in its fleet, Plaintiff's direct supervisor, Special Needs Area Manager Lisa Williams, denied his accommodation request without conducting any undue hardship analysis. Williams, who assigned herself a bus model with standing-room overhead clearance, stated to Plaintiff she would revisit the request at the end of the school year.

16.  Additionally, the DOT has routinely permitted non-disabled individuals to illegally park in designated disability-accessible spaces without consequence. Plaintiff has

repeatedly requested that the DOT faithfully enforce disability-accessible parking laws in DOT-supervised lots, but his requests have been largely ignored by DOT management, resulting in Plaintiff being regularly denied a specific and discrete disability accommodation mandated by state and local law.

17.     The DOT work environment is replete with hostility toward individuals with disabilities. On occasions Plaintiff has requested that his non-disabled coworkers not park in disability-accessible spaces, he has been yelled at and insulted. The WCPS Transportation Director, Defendant Chip Jenkins, has furthermore established a clear expectation that DOT employees must either (a) not be encumbered by any substantially limiting medical condition, or (b) be willing to engage in activities beyond their physical capacities if they wish to maintain their employment. In an early 2023 meeting with the Training Department, Jenkins demanded that trainers maintain "100% availability" at all times, including nights and weekends, and must furthermore perform any task assigned by management at any given time. Due to the limitations caused by Plaintiff's disability—as well as the medical needs of his spouse, who has multiple sclerosis—Plaintiff believed he would be precluded from meeting Jenkins' hardline physical demands and felt compelled to resign from his trainer position.

18.     Plaintiff has submitted multiple complaints to both the DOT and HR Department about the discriminatory treatment to which he has been subjected. Neither department has taken any remedial or corrective action upon receipt of Plaintiff's complaints, and on several occasions, WCPS officials have responded instead by taking unlawful retaliatory actions against Plaintiff.

19.     In Fall 2020, after the DOT denied his parking accommodation request, but granted the same request to another employee for reasons unrelated to disability, Plaintiff

complained about this disparate treatment to his supervisor at the time, Warren East Area Manager Edie Lowe. In response, Lowe berated Plaintiff, and shortly thereafter, she and Jenkins counseled Plaintiff for "not being a team player."

20.     On or around February 27, 2023, after the DOT denied his third parking accommodation request, Plaintiff met with Williams and Assistant Transportation Director Devonna Driver and expressed his frustration with the department's refusal to assist him with his disability-related requests. Williams chastised Plaintiff for referencing his disability and proceeded to question the severity of his condition. Following this meeting, Plaintiff reported to Driver that he believed Williams' conduct and other incidents he had experienced while employed with the DOT potentially violated laws protecting individuals with disabilities or WCPS policies regarding disabled employees.

21.     Later that evening, Plaintiff made the same report described in the preceding paragraph to HR Specialist Leanne Stewart. Plaintiff notified Stewart that his complaints also included potentially unlawful actions undertaken by Jenkins. As Plaintiff's reports involved WCPS managerial employees, Stewart escalated Plaintiff's complaints to then-Director of HR, Defendant James Francis and coordinated a meeting between him and Plaintiff scheduled for March 30, 2023.

22.     On February 28, 2023, Plaintiff also submitted a complaint directly with Williams regarding her discriminatory conduct the day prior. In an email to Williams, Plaintiff expressed his belief that her comments and actions were "very unprofessional and possibly discriminatory." Williams forwarded the email to Jenkins, but Plaintiff received no follow-up communications from Jenkins or any other DOT manager with regard to the discrimination complaints he voiced in his email.

23.    Over the course of the next several weeks, Jenkins, Francis, and their respective
departments inappropriately coordinated a preemptive defense to Plaintiff's
discrimination complaints. Francis or one of his agents informed Jenkins about the
time, date, and subject matter—i.e., discrimination complaints against the DOT,
generally, and Jenkins, specifically—of Plaintiff's March 30 meeting. Moreover,
Francis or one of his agents invited Jenkins to attend the second half of the March
30 meeting without providing prior notice to or obtaining consent from Plaintiff.
Jenkins and the HR Department also jointly scoured Plaintiff's personnel records in
an effort to fabricate a defense of ignorance with regard to Plaintiff's disabling
conditions. Finally, Jenkins commandeered the annual performance evaluation
process for Plaintiff, which, until the events described in these pleadings, had
always previously been the responsibility of Plaintiff's direct supervisor.

24.    On March 29, 2023, Plaintiff attended a meeting with Jenkins and Driver during
which he was given his annual performance evaluation. Although in years past,
Plaintiff's evaluation was always delivered by his direct supervisor, on this occasion,
Williams—who purportedly authored Plaintiff's 2022-23 evaluation—was not
present; instead, Jenkins commandeered the process to directly administer the
evaluation himself.

25.    During the meeting, Jenkins informed Plaintiff of the scores he was assessed by
Williams in the various categories of performance measured in the DOT's evaluation,
and further read to him the purported commentary written by Williams for each
category. For the category of interpersonal relations, Williams had assessed Plaintiff
a negative score and filled the comment section of the category with unfair,
inaccurate, and retaliatory criticisms of Plaintiff clearly related to his disability
discrimination complaints. Williams' comments stated expressly:

> All interpersonal relations are built on trust, support, and loyalty. It has been expressed by Paul that he doesn't feel that he has those with the current management or supervisors. Mr. Stigers has become defensive and confrontational this school year with management, and expresses negativity openly among his peers. His abrupt change in his behavior this year has caused a separation from the team members. Mr. Stigers' actions and outbursts have resulted in interpersonal relationships being strained, some possibly to the point of being unrepairable. If proper steps had been followed, such as familiarizing himself with policy and procedure, following chain-of-command, and sharing his concerns openly with management, these issues could have been resolved in a timely manner without conflict and undue stress.

26. The evaluation's conclusion continued with unwarranted criticisms of Plaintiff, and furthermore falsely implied that the DOT had removed Plaintiff from his trainer role for behavioral reasons by representing that the DOT would "consider" allowing Plaintiff to return to the position after undertaking "corrective action" on his purported interpersonal issues.

27. Plaintiff challenged the negative score on his evaluation and Williams' absurd commentary, pointing out that the poor grade and negative remarks were all in reference to his attempts to secure reasonable accommodation for his disability or otherwise advocating for his rights as an individual with disabilities. Plaintiff further called attention to the fact that the DOT has only ever taken issue with his behavioral performance when he has been engaged in disability-related advocacy, such as the occasion in Fall 2020 when Jenkins and Lowe counseled him for challenging the DOT's refusal to grant him a disability-related parking accommodation. He emphasized that, for the years "when I've shut my mouth, and when I've said nothing, and when I've been in pain and just worked, nothing has been said to me and I've gotten better evaluations."

28. Plaintiff further addressed with Jenkins (i) the DOT's failure to enforce disability-accessible parking laws, (ii) the hostility he's experienced in requesting

that the accessible parking laws be enforced, and (iii) the several occasions on which he has been denied reasonable accommodation. Jenkins dubiously declared he had no knowledge of Plaintiff's "handicap," despite the two having spoken directly about Plaintiff's disability on many prior occasions. After Plaintiff reminded Jenkins of this fact, Jenkins nevertheless continued to insist that he had no knowledge of Plaintiff's disability, and further asserted that on those prior occasions referred to by Plaintiff—i.e., the instances in which Plaintiff had requested accommodations or reported disability-accessible parking violations—he had merely believed Plaintiff was advocating for other unnamed, disabled coworkers, rather than for his own rights as an individual with a disability.

29.     After Plaintiff addressed several more discriminatory incidents occurring within the DOT, Jenkins announced abruptly that he was going to revise the "improvement needed" score for the interpersonal relations category to "meets expectations." The retaliatory criticism, however, was mostly left in the revised appraisal. When Plaintiff requested to keep a copy of the original evaluation for his own records, Jenkins threatened to leave the original poor score in place if Plaintiff insisted on retaining a copy.

30.     On March 30, 2023, Plaintiff met with Francis and Stewart. Although Plaintiff was under the impression that he was being afforded the opportunity to fully report his discrimination complaints against Jenkins and the DOT, Francis quickly dispelled this notion. As Plaintiff attempted to explain the DOT's established history and pattern of disability discrimination, Francis interrupted to place the blame for the DOT's unlawful conduct on Plaintiff. Francis asserted that Plaintiff had not gone through the "normal process" of seeking disability accommodations, and rebuffed Plaintiff's attempts to explain that he had never been provided information on the

accommodation process from DOT management, despite several requests for such information. Francis further stated that he could not do anything about past discriminatory actions against Plaintiff—a position he would restate numerous times throughout the meeting.

31. Plaintiff was further distressed to learn from Francis that he had invited Jenkins to join them in the latter half of the meeting, and that Francis intended for Plaintiff to repeat his complaints and disclosures to Jenkins directly—with an instruction from Francis to limit his discussions with Jenkins to only the issues regarding his performance evaluation and most recent accommodation denial. Francis imposed this process on Plaintiff without first seeking his consent, and furthermore failed to provide Plaintiff notice that he had the opportunity to bring a person of his choice to accompany him during the meeting, all in violation of WCPS Personnel Procedure No. 03.162 AP.21, "Harassment/Discrimination Investigation Appeals."

32. Nevertheless, Plaintiff did his best to communicate his discrimination and retaliation complaints to Francis. Plaintiff informed Francis of the many accommodation denials, the DOT's chronic noncompliance with disability-accessible parking laws, the hostility he experienced when addressing the DOT's noncompliance, and the retaliatory evaluation Jenkins had attempted to administer the day prior. With regard to Plaintiff's disclosures about the evaluation process, Francis acknowledged that Plaintiff's report constituted a complaint of retaliation against Jenkins.

33. Plaintiff proceeded to then disclose a series of incidents in which he suspected Jenkins violated Kentucky laws governing pupil transportation and bus driver employment qualifications. Specifically, Plaintiff disclosed to Francis and Stewart a number of acts committed by Jenkins with regard to the training and recertification

requirements for DOT bus driver Charlie Graves following his rehire in Summer 2022 after a break in service.

34.    The laws governing bus driver qualifications in Kentucky include, *inter alia*, the Kentucky Board of Education's ("KBE") administrative regulations governing pupil transportation, promulgated pursuant to KRS 156.160(1)(k) and imposed on local school districts, including WCPS, pursuant to KRS 158. 110(4). *See also* PUPIL TRANSPORTATION, 702 KAR Chapter 5. Therein, the KBE regulations set forth specific requirements for bus driver training, certification, and recertification, including but not limited to the following:

(a) A school bus driver must have a current, valid Commercial Driver's License ("CDL") with the proper school bus endorsement, pursuant to KRS 281A.170 and 281A.175. *See* 702 KAR 5:080 § 1;

(b) Prior to the beginning of each school year, a bus driver shall successfully complete a district-specific 8-hour update training conducted by a certified driver trainer. *See* 702 KAR 5:030 § 5; *see also* 702 KAR 5:080 § 4(1)(b)–(c);

(c) The 8-hour update training must be conducted in accordance with the Kentucky Department of Education's ("KDE") Kentucky School Bus Driver Trainer Manual ("KSBDT Manual"). *See* 702 KAR 5:030 § 5; *see also* 702 KAR 5:080 § 4(1)(c);

(d) A bus driver must complete the 8-hour update training prior to engaging in any pupil transportation. *See* 702 KAR 5:030 § 4; *see also* 702 KAR 5:080 § 4(1)(b), (e);

(e) The district superintendent or designated district employees must submit evidence confirming a bus driver's completion of the 8-hour update training to the KDE's Division of Pupil Transportation. *See* 702 KAR 5:030 § 5.

35.    The KSBDT Manual and its provisions are furthermore expressly incorporated by reference into the KBE's regulation governing bus driver qualifications and training. *See* 702 KAR 5:080 § 19(1). Therein, the KSBDT Manual imposes additional mandatory requirements on the required training processes, including the following:

(a) All written tests required in the course must be taken in the training classroom, closed book. *See* Ky. Dep't of Educ., Ky. Sch. Bus Driver Training Man. at 11 (ed. 2020);

(b) Trainees are prohibited from taking tests home to complete. *See id*. at 11;

(c) All in-class training must be completed with the designated driver trainer present in the classroom. *See id*. at 15; and

(d) Driver trainers are required to document that proper training has been administered to each trainee. *See id*. at 15.

36.     The KSBDT Manual further expounds on the procedural requirements for bus driver

certification, setting forth the following:

> The Kentucky Department of Education, Division of District Support, Pupil Transportation Branch, grants certification of all drivers and driver trainers. This certification may be revoked, at any time, at the discretion of the Kentucky Department of Education, Division of District Support, Pupil Transportation Branch. Improperly training a driver, falsifying documentation, failure to properly certify a driver, and failure to attend mandatory updates, may qualify as reasons to have certifications revoked.

Ky. Dep't of Educ., Ky. Sch. Bus Driver Training Man. at 3.

37.     With regard to Jenkins' violation of the above administrative provisions, Plaintiff

disclosed that when Graves was rehired in Summer 2022,[1] Jenkins circumvented the

state-mandated training requirements for Graves to begin driving buses before

meeting all the necessary criteria for his recertification. Specifically, Jenkins

permitted Graves to skip in-person attendance of the 8-hour update training course

administered by a certified driver trainer, and instead provided Graves with all the

course materials for self-study at home. Jenkins also directed or permitted Graves to

take the mandatory written examinations required for completion of the 8-hour

---

[1] During this timeframe, WCPS was experiencing a well-documented shortage of bus drivers. *See* Sarah Phipps, *Warren County Schools Try to Navigate Bus Driver Shortage*, WBKO-13, https://www.wbko.com/2022/06/23/ warren-county-schools-try-navigate-bus-driver-shortage/ (last accessed July 26, 2023).

update training at home, open-book, and outside the observation of any driver trainer.

38.    After Graves submitted his completed written examinations, Jenkins' administrative assistant, Michelle Dennis, approached Plaintiff, who then was still working as a certified driver trainer, and requested that he grade Graves' examinations and sign them to certify the results. Plaintiff agreed to grade the examinations, but he refused to certify that Graves had obtained passing scores, as Plaintiff had neither administered any of the corresponding in-person training to Graves, nor observed him taking the examinations.

39.    On information and belief, Jenkins or an administrator acting on his behalf, approached other driver trainers with the same request, all of whom likewise declined to certify the test results. As no driver trainers were willing to certify Graves' training examinations, Jenkins ultimately certified the examinations himself, which were thereafter submitted to the KDE's Division of Pupil Transportation as evidence that Graves had received and completed the 8-hour update training course.

40.    Plaintiff further disclosed to Francis and Stewart that he suspected Jenkins deployed Graves to drive an assigned bus route prior to obtaining all the necessary qualifications for recertification. Plaintiff's suspicions were informed by representations made by Graves when the DOT training staff attempted to administer the "Vehicle Control at Speed" test. The aforementioned test involves a driver trainer observing a trainee's practical driving skills while maneuvering a bus through a DOT obstacle course. When one of the DOT's driver trainers attempted to coordinate administration of the exam on the scheduled day, Graves informed the trainer that he was unavailable because Jenkins already had him driving a bus

route that day. Plaintiff informed Francis and Stewart that Jenkins likely directed the DOT to identify Graves as a bus monitor in administrative records generated during this timeframe, so as to avoid documentation of Graves' unlawful driving assignment.

41.    Not long after Plaintiff made the above disclosures, Jenkins arrived at the meeting. Francis then directed Plaintiff to address his concerns regarding the performance evaluation and accommodation denial. Plaintiff did as directed, reporting to Jenkins that his recent evaluation appeared retaliatory in light of his discrimination complaints, and further reiterated his frustration with the DOT's refusal to accommodate his disabilities for several years. In response, Jenkins gave vague explanations for his and the DOT's actions.

42.    Plaintiff left the meeting with no resolution to his complaints of discrimination and retaliation, but understood Stewart would be providing him forms to make an accommodation request. Prior to concluding the meeting, Francis never inquired whether Plaintiff felt his complaints had been resolved, nor informed Plaintiff of the formal grievance initiation procedures—further violations of WCPS Personnel Procedure No. 03.162 AP.21.

43.    Following Plaintiff's protected complaints and disclosures on March 30, 2023, the DOT and HR Department, acting in concert, commenced an ongoing campaign of retaliation against Plaintiff.

44.    In the workweek starting April 3, 2023, the WCPS spring break commenced. Over the course of the week, Plaintiff again submitted his requests for reasonable accommodation of his disability to WCPS, and yet again, his requests were unlawfully denied.

45.    On April 4, 2023, in furtherance of his requests for reasonable accommodation, Plaintiff submitted to Stewart a letter from his physician, Phillip J. Singer, MD, an orthopedic surgeon practicing with Western Kentucky Orthopaedic and Neurosurgical Associates, an affiliate of Graves Gilbert Clinic. In the letter, Dr. Singer set forth three work restrictions corresponding to Plaintiff's DDD: (i) no standing or walking for more than thirty minutes at a time; (ii) reassignment to a bus that permits Plaintiff to stand fully upright; and (iii) no lifting over 30 pounds. Stewart forwarded the work restrictions to Jenkins for consideration.

46.    On April 7, 2023, Stewart sent Plaintiff an email denying his requested accommodation of a 30-pound lifting restriction, with the purported reason being a "safety issue" in the event of a scenario requiring evacuation of his bus.  Stewart proceeded to inform Plaintiff that he could not return to work in his bus driver position until the lifting restriction was removed. She further related that she had asked the DOT if Plaintiff could be used in any other capacity, and reproduced the DOT's response in her email verbatim:

> Yes ma'am if he wishes to return to the training position which is only on an as needed basis for all trainers *we can meet his accommodations*.

47.    Plaintiff responded to Stewart's email that day, notifying her that he would accept the trainer position until he could resolve the matter of his lifting restriction. He further informed Stewart that he and his physician were working on treatment plans to increase Plaintiff's lifting capacity, and requested the specific lifting benchmark he would be required to meet in order to return to work. Copied on Plaintiff's email response to Stewart was also Jenkins, Driver, and Francis.

48.    Because the trainer position only received work assignments on an as-needed basis, the DOT's removal of Plaintiff from the bus driver position would necessarily result

in his absence for most of the remaining school year. Accordingly, Plaintiff notified Stewart he wished to apply for FMLA leave to cover the absences between his trainer assignments. In response, Stewart represented that Plaintiff could not work in any capacity if he chose to take FMLA leave, and expressly instructed him to choose between seeking FMLA leave—which, under federal law, would protect Plaintiff from adverse action premised on his absence—or accepting the trainer position.

49.   Plaintiff reiterated to Stewart that he was accepting the trainer position and further clarified that he was seeking FMLA leave for his intermittent absences between trainer assignments. He also again requested that Stewart identify the lifting benchmark he must reach to return to work. Stewart thereafter did not respond to any of Plaintiff's statements or inquiries. As with the preceding email, Jenkins, Driver, and Francis were all copied on the communication.

50.   On April 10, 2023, Plaintiff delivered to Dr. Singer a copy of the DOT's Physical Demands Analysis ("PDA") for the bus driver position, which Dr. Singer did not previously have access to when drafting his initial set of work restrictions for Plaintiff.

51.   The Driver PDA is a report created in March 2019 by occupational health experts commissioned by WCPS, which provides an objective, quantitative evaluation of all the physical demand components of all job-related tasks for the bus driver position, both essential and non-essential.

52.   Included in the essential functions listed by the Driver PDA are the following items regarding emergency bus evacuations:

   (a) Bus driver must be able to assist students exiting the bus in the event of an emergency; and

    (b) Bus driver must be able to drag students on fire blanket in the event of an emergency.

53.    The Driver PDA further identifies the particular physical demands for all lifting, pushing, pulling, and carrying requirements for the bus driver position, which include only the following:

    (a) Bus driver must be able to lift a _minimum of 30 pounds_ from ground level to a height of 18 inches to complete various duties associated with essential job functions, such as lifting a small child into their seat. This function was categorized by the PDA as being required only occasionally for the bus driver position, or 1-33% of an 8 hour work day;

    (b) Bus driver must be able to complete front carries of a minimum of 30 pounds for distances of up to 30 feet to complete various duties associated with essential job functions, such as carrying or assisting a student exiting the bus in the event of an emergency. This function was also categorized by the PDA as being required only occasionally for the bus driver position; and

    (c) Bus driver must be able to generate a minimum push and pull force of 50 pounds for opening windows, opening hood of bus, opening roof hatches, engaging/disengaging parking brake, maneuvering wheelchairs, performing blanket drags and opening rear/side door emergency exits. This function was also categorized by the PDA as being required only occasionally for the bus driver position.

54.    The Driver PDA also includes a chart identifying the frequency with which a bus driver would be required to lift specific weight ranges. As the following table reproduced from the PDA confirms, WCPS bus drivers are _never_ required to lift, push, or pull more items weighing more than 50 pounds during their regular course of employment:

| Lifting/Pushing/Pulling | | | | |
|---|---|---|---|---|
| **Weight/Force** | **Amount of Time** | | | |
| | **Never (0%)** | **Occasional (0-33%)** | **Frequent (33-66%)** | **Constant (67-100%)** |
| Less than 5 lbs. | | X | | |
| 5-25 lbs. | | X | | |

| | | | | |
|---|---|---|---|---|
| 26-50 lbs. | | X | | |
| 51-100 lbs. | X | | | |
| > 100 lbs. | X | | | |

55.    The physical demands identified in the Driver PDA are consistent with the physical demands identified in the formal job description for the bus driver position, which was most recently revised by WCPS on July 1, 2022. With regard to any lifting, pushing, or pulling demands, the job description does not identify any 50-pound lifting requirement for the position; but rather merely states:

> The work requires bending, squatting, crawling, climbing, reaching, with the ability to carry, push, or pull *medium weights*.

56.    After reviewing the physical demands identified by the Driver PDA, Dr. Singer issued Plaintiff revised work restrictions. Dr. Singler left in place the walking/standing and bus assignment restrictions as initially written, but modified the weight limit for Plaintiff's lifting restriction from thirty pounds to only items over fifty pounds. Dr. Singer further stated expressly in his letter that Plaintiff "[c]an perform duties as described in physical demands analysis."

57.    The following morning, April 11, 2023, Plaintiff picked up the revised restrictions from Dr. Singer's office and promptly emailed a copy of the letter to Stewart. Stewart did not respond to Plaintiff's email whatsoever.

58.    On April 13, 2023, after hearing nothing from Stewart for two days, Plaintiff sent a follow-up email to her inquiring whether he had been released to return to work in light of his revised restrictions. Two hours later, Stewart responded tersely that WCPS would also not accommodate his revised lifting restriction. Stewart further directed him to notify Jenkins and Driver if he wished to accept the trainer assignment, despite the fact that Plaintiff had communicated his acceptance of the

assignment in multiple emails to Stewart, Jenkins, and Driver only six days prior on April 7.

59.    Following Stewart's email, Plaintiff traveled to Bowling Green Veterans Affairs Clinic to obtain an evaluation of his physical lifting capacity. Plaintiff emailed Stewart again to request the weight limit benchmark he was required to meet in order to return to work. Nearly an hour later, Stewart emailed Plaintiff back a response: "A driver cannot have a lifting restriction/limit."

60.    In a subsequent email, Stewart continued to falsely suggest that Plaintiff could not work in any capacity if taking FMLA leave. Despite Plaintiff's multiple communications confirming his acceptance of the trainer position, Stewart further continued to dubiously assert that he had not yet indicated whether he accepted the position.

61.    Plaintiff then requested from Stewart that she identify the particular policy or regulation that prohibits bus drivers from having any restriction on lifting activities. Conspicuously, Stewart could not provide Plaintiff an answer and instructed him to make his inquiry to the DOT directly. Plaintiff did as Stewart instructed and forwarded his inquiry to Jenkins that same day.

62.    The following day, April 14, 2023, Jenkins responded to Plaintiff's email with a rambling, nonsensical justification for his denial of the requested accommodation:

> Paul, according to the KRS statute we reviewed there can be no physical limitations on a driver. He would have to have the weight restriction removed from his doctor's statement. 702 KAR 5:080 Section 2 - subsection (2), (4). Even though we had used agility testing in the past of a certain weight used for passing a driver on that part of our district guidelines, if they were unable to complete it, that would revert to the KRS statute.

63.    The regulation cited by Jenkins does not state that bus drivers cannot have any physical limitations. Rather, the regulation provides as follows:

(a) Each bus driver must pass an annual medical examination. *See* 702 KAR 5:080 § 2(1);

(b) A bus driver must be physically and mentally able to operate a school bus safely. *See* 702 KAR 5:080 § 2(2);

(c) A person shall not be employed as a bus driver if there is a limitation of motion due to disease or injury that limits the ability to safely perform the task of driving a school bus or performing other driver responsibilities. *See* 702 KAR 5:080 § 2(3); and

(d) A temporarily-injured bus driver may be assigned duties other than driving until the employee regains the ability to safely perform driver duties. *See* 702 KAR 5:080 § 2(4).

64. Plaintiff responded to Jenkins by pointing out that the regulation he cited did not list any particular lifting requirement, and noted further that his doctor stated expressly that he can perform all the duties of the bus driver position even with the lifting restriction in place. Plaintiff also called Jenkins' attention to another provision in the regulation, 702 KAR 5:080 § 2(7), which authorized WCPS to provide for special medical examination at the school district's expense, and asked if WCPS would do so.

65. In reply, Jenkins continued to insist that Plaintiff could not have any restriction on lifting any amount of weight. Jenkins further acknowledged that WCPS could order another physical examination for making a determination on Plaintiff's return to work, but he was going to "leave that up to Dr. Francis and his department to determine that."

66. Plaintiff thereafter waited for two weeks to hear back on his request for a special medical examination, but received no follow-up communication on this request from Francis, Stewart, or any other person from the HR Department.

67. On April 24, 2023, Stewart sent an email to Plaintiff informing him that the DOT was rescinding the trainer position offer. Although the DOT had expressly confirmed

on April 7 that it could accommodate Plaintiff's lifting restriction for the trainer position—when the restriction was still limited to thirty pounds—Stewart now claimed that the DOT could not accommodate his loosened lifting restriction for weights over fifty pounds. Stewart notably did not purport that the accommodation denial and rescinded offer were premised on so-called "safety" concerns, but rather stated simply that the trainer position "may also require lifting over the 50 pound restriction you're currently under."

68. The formal job description for the trainer position maintained by WCPS does not contain any provision setting forth minimum weights for lifting requirements associated with the role. Rather, the trainer job description incorporates the exact same language on the subject of physical demands utilized in the bus driver job description.

69. On April 27, 2023, Plaintiff emailed Francis and Stewart, with Jenkins and Driver copied, asking whether a determination had been made with regard to his medical exam request. Francis responded within a few minutes, stating only the following:

> Thank you for your email and question. The district has made the decision not to do a different evaluation. Have a great night. Bless those around you.

Francis offered no elaboration on the reasons for his decision and made no attempt to explain why WCPS was not willing to evaluate whether Plaintiff's lifting restriction actually limited his ability to safely perform the essential functions of the bus driver position.

70. That same day, WCPS sent to Plaintiff his renewed employment contract for the upcoming 2023-24 school year for review and execution.

71. On May 9, 2023, Plaintiff emailed Stewart requesting information on WCPS's new short-term disability insurance provider. Stewart responded with the requested

information the following day, May 10, 2023. She then proceeded, bizarrely, to state the following:

> [I]t has come to our attention that you've not been reporting to work nor calling in for several days. You did not return FMLA paperwork, so you are not currently on any approved leave. We either need a completed FMLA form or a doctor's note to cover your absence by the end of the business day tomorrow, 5/11/23, or we will have to move to have you terminated.

72.    Plaintiff responded that he was unaware that WCPS was requiring him to "report to work" since the DOT and HR had prohibited him from returning to work as either a bus driver or trainer. He further explained that he had not been instructed to call his absences in and was unaware of this expectation since both DOT and HR management were all involved in the decision to remove him entirely from the workforce. He also reminded Stewart that he had previously stated to her that he wished to apply the remainder of his sick leave to his absences.

73.    Early the next morning, May 11, 2023, Plaintiff visited Results Physiotherapy, where his DDD-related limitations were evaluated for physical therapy treatment by John Paszkiewicz, PT. During the evaluation, Plaintiff demonstrated the capacity for lifting weights of at least 52 pounds and carrying the same weight a distance of 68 feet. Paszkiewicz determined Plaintiff possessed good rehabilitation potential and ordered a regimen of 14 additional therapy sessions to occur over the course of the next three months.

74.    Following his physical therapy evaluation, Plaintiff procured and delivered to Stewart an FMLA medical certification form completed by Dr. Singer. Therein, Dr. Singer specified that Plaintiff required up to two days of intermittent FMLA leave for medical appointments to treat his DDD and for flare-ups of symptoms related to the condition.

75.  Stewart responded to Plaintiff with an email later that morning, informing him that she was not approving Dr. Singer's recommendation of intermittent leave because "it has already been determined that all of your restrictions cannot be accommodated." She instead placed Plaintiff on consecutive FMLA leave for the period of April 10 through May 26, 2023, the end of the 2022-23 school year.

76.  After the DOT and HR Department placed Plaintiff on involuntary leave, Plaintiff did not receive any meaningful communication from either department for nearly two weeks. Particularly concerning to Plaintiff was the lack of instruction provided to him by the DOT and HR Department with regard to his attendance at the summer training update required for bus driver recertification pursuant to the aforementioned KBE regulations, without which Plaintiff is prohibited from engaging in any pupil transportation activities. Accordingly, on May 24, 2023, Plaintiff emailed Jenkins, Francis, and Stewart to inquire about his summer update training and recertification requirements.

77.  On May 25, 2023, Stewart responded to Plaintiff's inquiry, informing him that WCPS was also prohibiting Plaintiff from attending his required training updates and recertifications because he was still on FMLA leave. Specifically, Stewart misrepresented to Plaintiff that Dr. Singer had placed him on FMLA leave from March 22 to September 22, 2023, and that Plaintiff could not attend any work-related activities whatsoever during that timeframe.

78.  Stewart's representation was categorically false, as Dr. Singer had represented in his FMLA certification paperwork that Plaintiff required only intermittent leave during the above timeframe. Rather, Stewart was the individual who put Plaintiff on consecutive leave, overruling the professional medical opinion of Dr. Singer. Moreover, Stewart had only two weeks prior represented to Plaintiff that his FMLA

leave would conclude on May 26, 2023; she did not represent at any point that WCPS would continue to impose noncompliant FMLA leave punitively against Plaintiff throughout the summer break. Moreover, the summer training updates did not involve any student transportation or lifting of any sort, and therefore did not feature any of the purported reasons WCPS had previously invoked when denying Plaintiff his accommodations or continued employment in either the bus driver or trainer position. Plaintiff made all of the above points in his reply to Stewart, Jenkin, and Francis, emailed later that day. Plaintiff further requested that the HR Department explain the basis for refusing to allow him to attend the mandatory training updates required for his continued employment with WCPS.

79. On May 26, 2023, Francis responded to Plaintiff's email. Francis ignored the points and inquiries for clarification raised by Plaintiff, and instead responded with only the following:

> Good morning to all,
>
> I hope all of you are doing GREAT! The restrictions that were requested pre [*sic.*] Mr. Stiger's doctor could not be accommodated by the district. Therefore, Mr. Stinger [*sic.*] may return to work when his doctor clears him to do so, with no restrictions. Have a great weekend.

80. Plaintiff responded by again asking whether WCPS had a lifting weight he should reach for being released to work. Francis responded on May 30, 2023, stating that Plaintiff would have to speak with his doctor about the lifting weight benchmark—a benchmark that could only be set by WCPS—and stated further that "from an HR perspective employees on leave cannot work." Francis, of course, made no mention of the fact that WCPS itself imposed a full, consecutive FMLA leave on Plaintiff, rather than the intermittent leave requested by Plaintiff and Dr. Singer which would not carry such severe exclusionary penalties.

81.    On June 6, 2023, the DOT conducted the summer training update for bus drivers. Plaintiff was not permitted to attend and therefore was prohibited by WCPS from obtaining the necessary training recertification he is required by law to have in order to drive a bus during the 2023-24 school year. On information and belief, no lifting of any sort was required by employees during the training.

82.    On or about June 7, 2023, WCPS posted to its online career portal a vacancy for a Special Needs bus driver—the exact position held by Plaintiff.

83.    Sometime following the conclusion of the 2022-23 school year and prior to commencement of the 2023-24 school year, WCPS removed Francis from the position of HR Director for unknown reasons, and replaced him with interim director Shea Guy.

84.    Over the course of the summer months, Plaintiff successfully completed his 15-session physical therapy course with Paszkiewicz. During multiple sessions, Plaintiff demonstrated the ability (i) to lift weights of at least 52 pounds from floor-to-waist and waist-to-shoulder "without biomechanical breakdown"; and (ii) to push and pull weights of at least 180 pounds.

85.    On August 9, 2023, WCPS began its 2023-24 school year. In the weeks leading up to and for over two weeks after the start of the new school year, Plaintiff received no contact or other communication from anyone at WCPS, the DOT, or the HR Department with instructions to Plaintiff regarding his employment, FMLA leave, or return to work.

86.    On August 23, 2023, WCPS finally contacted Plaintiff, with Stewart sending him the following email:

    Hello Mr. Stigers,

Payroll has contacted me to say they have a blank timesheet for you and that the bus garage indicates you are not working. I know you ended last school year on leave and we told you if you would need medical leave again this year, you would need to submit new paperwork for that.

I have not had any communication from you this school year regarding a need for leave. I checked with Dr. Singer's office to see if they needed to send us leave paperwork and I was told they would not send any paperwork unless you had an appointment because they have not treated you since March of this year.

Please let me know as soon as possible if you plan to request medical leave for this school year.

87.    Plaintiff responded a short time later:

I had no plans on taking medical leave last year or this year. I asked during the summer about going to update trainings and was told I would not be retrained and have not heard from anyone since then. Not one person from the bus garage or HR has reached out to me regarding what the next steps are for me to return.

88.    In reply, Stewart sent the response below:

You were placed on FMLA/medical leave last year and released with restrictions that could not all be accommodated (the 50 lb. weight limit could not be accommodated because we were not able to guarantee that no student on your bus would weigh over 50 lbs), so you had to remain on leave. We have never received an updated release note clearing you from the restrictions; if you can provide that, we will get you back to work upon your doctor's release. If your doctor cannot clear you to work, then we need to know if your doctor needs to have you placed on medical leave again.

89.    Frustrated with WCPS's continuing retaliatory acts against him and the transparently pretextual justifications for those actions, Plaintiff sent Stewart the following response:

There were no students on the bus for the summer updates for driver and driver trainer but I was still refused training by Mr. Jenkins. If the reason for not allowing to work was students on the bus, what was the reason for not allowing me to recently [attend] summer update trainings?

26

So besides my doctor's release I need to know what the plans for retraining are. Also my previous paperwork has an expiration of September 23, 2023 if I remember correctly.

I also have not heard back from HR regarding any of my complaints and their resolutions.

90. Stewart thereafter replied:

Mr. Stigers,

You cannot be released back to any duty (training or otherwise) until cleared by your doctor. I told you when we had to have you remain on leave (when all restrictions could not be accommodated) that you would remain on leave for the rest of that school year (unless cleared by your doctor to return without the restrictions) and that if you needed to remain off at the start of this school year, we would have to get new documentation for a new school year (our school contracts run July 1 through June 30, so I cannot use the same paperwork we had in the spring to place you on leave for 2 different school years).

91. Plaintiff thereafter contacted Dr. Singer's office and coordinated an appointment for September 5, 2023. The following morning, August 24, 2023, Plaintiff responded to Stewart's most recent email with the following:

The earliest appointment available is September 5. I finished PT[2] on Aug 22. The therapist and chiropractor still say I can perform the duties listed in the job analysis so unless you have new standards I'm not sure what else I can give my doctor to judge whether or not I can go back with different restrictions.

92. Plaintiff did not hear back from Stewart for nearly a week, until on August 30, 2023, she sent him the following email:

Good morning Mr. Stigers,

I have been advised that we are to use the FMLA paperwork initially submitted from Dr. Singer to place you on FMLA/medical leave 3/22/23 through 9/22/23, to place you on leave this school year 8/7/23-9/22/23. Dr. Singer will also need to be the person to indicate when you are able to be released back to work.

Please note that since you began use of FMLA toward the end of last school year, 45 of the 60 available days were used, so you had 15

---

[2] The acronym "PT" as used by Plaintiff refers to physical therapy.

FMLA days available at the start of this 2023-24 school year, which means your FMLA exhausted on 8/25/23. Even though the FMLA exhausted, you will still remain on medical leave until cleared by Dr. Singer to return to work, you just no longer have the protection of employment and benefits that FMLA offers. That means, upon return, you will be placed in a position within the district, but are not guaranteed to return to the same position in the same location. As far as protection of benefits, when FMLA exhausts, if an employee goes through an entire pay period unpaid, their insurance could term until they are able to return to work and have insurance reinstated (our Benefits Coordinator, Jamie James, would assist you with that). Please check with Jamie if you have any questions related to that.

Since your doctor has placed you off work for more than 10 days, you are eligible to request donated sick days. If you'd like to make that request, let me know and I can send you an email template you can use to send out to coworkers in your department (if you want to send to anyone else in the district, please send to them individually). If you receive donated days, those would take effect the day after your own PTO was exhausted; as long as you continue to be paid, whether through your own PTO or use of donated days, your insurance would stay intact.

When Dr. Singer is ready to clear you back to work, please have him fax a release note to me at [XXX-XXX-XXXX][3] so we can get you going!

93. On September 5, 2023, Plaintiff attended his appointment with Dr. Singer for reevaluation of his DDD condition after several months of physical therapy. At the conclusion of the examination, Dr. Singer authored a letter in which he released Plaintiff to return to work that same day with a revised lifting restriction—which Dr. Singer increased to weights *greater than 75 pounds*—and an instruction that WCPS grant Plaintiff accommodations that would allow him to stand fully upright when necessary. Shortly thereafter, Plaintiff submitted Dr. Singer's letter to Stewart by email.

94. Three days later, on September 8, 2023, WCPS again refused to grant the reasonable accommodations requested by Plaintiff, and again refused to return him to work in any capacity. The email sent to Plaintiff from Stewart that morning reads as follows:

---

[3] Facsimile number redacted.

> Good morning,
>
> Thank you for sending an update. Our legal counsel has advised that once you are cleared of restrictions, you will be able to return to work, so please keep me updated with any notes as you have follow-up appointments. At this time, I have you scheduled to remain on leave through 9/22/23 per your FMLA paperwork.

95. Based on the overt discriminatory and retaliatory acts taken by WCPS against Plaintiff to date, it is apparent that the DOT and HR Department have no intention of permitting Plaintiff to return to his regular employment, but instead are manufacturing pretextual circumstances to justify his termination while concealing the illegal motives of WCPS officials from both departments.

96. Other than the in-service training requirement that the DOT and HR Department unlawful prohibited Plaintiff from attending, Plaintiff objectively meets the qualifications for the positions of WCPS school bus driver and driver trainer, as demonstrated by the following:

   (a) Plaintiff holds a valid CDL with the proper school bus endorsement, pursuant to 702 KAR 5:080 § 1;

   (b) Plaintiff passed the required annual CDL medical examination administered by the U.S. Department of Transportation, Federal Motor Carrier Safety Administration, pursuant to 702 KAR 5:080 § 2(1), demonstrating his medical fitness for the bus driver position; and

   (c) Plaintiff has no limitation that prevents him from safely performing the task of driving a school bus or other driver responsibilities, pursuant to 702 KAR 5:080 § 2(3). Plaintiff has been determined physically capable of performing the physical demands of the bus driver and driver positions by multiple medical professionals, and he has furthermore demonstrated the physical capacity to perform the following tasks:

      (i) Regularly lift weights up to 75 pounds, well in excess of the 50-pound maximum weight which is occasionally required for the bus driver position pursuant to the Driver PDA; and

      (ii) Push and pull weights up to 180 pounds on a sled, which mirrors the technique taught to WCPS bus drivers for evacuating incapacitated students in emergency situations.

97.   The justification advanced by Jenkins, Francis, the DOT and the HR Department for refusing to grant Plaintiff's requests for reasonable accommodation—and for prohibiting Plaintiff from working at all—is a retaliatory pretext. There was no bona fide safety concern presented by Plaintiff's lifting restriction on weights over 50 pounds, and there is no bona fide safety concern presented by Plaintiff's current 75-pound lifting restriction. WCPS does not require its bus drivers to demonstrate the capacity to lift any weight above 50 pounds in order to pass the annual medical examination mandated by 702 KAR 5:080 § 2(1). Moreover, the Driver PDA commissioned by WCPS for the bus driver position demonstrates conclusively that bus drivers are not ever required to lift in excess of 50 pounds during the course of their employment.

98.   Furthermore, the purported safety concerns relied upon by Jenkins to deny Plaintiff access to equal employment opportunities are vague, remote, and not supported by any factual data. According to the KDE's publicly-available data for the 2021-2022 school year, there were a total of 1,038 bus-related automotive incidents across all Kentucky school districts. Of those incidents, there were a total of 5 moderate student injuries and 124 minor student injuries; there were no student fatalities or serious student injuries involving incapacitation. These totals are juxtaposed against the staggering _2,607,120_ bus trips on designated bus routes during the same timeframe, demonstrating that only 0.00019% of bus trips for the entire school year _across all Kentucky school districts_ involved accidents in which a student experience a moderate, non-incapacitating injury, and that only 0.0047% of those trips involved accidents in which a student experienced a minor, non-incapacitating injury. Accordingly, the statistical likelihood of Plaintiff even being party to an accident involving any incapacitating injury to a student is effectively non-existent, as is the

likelihood he would ever be required to lift more than 50 pounds in an emergency setting.

99.    Moreover, the purported safety concerns relied upon by Jenkins to deny Plaintiff access to equal employment opportunities are not applicable to the driver trainer position whatsoever, as the position's duties do not include pupil transportation.

100.    WCPS has indicated its intent to terminate Plaintiff's employment following September 22, 2023, despite no legitimate reason for refusing to restore him to his regular work.

101.    Plaintiff is and will continue to be irreparably injured by the actions of WCPS in the form of lost employment, lost wages, and lost benefits, unless WCPS is expediently enjoined from its unlawful denial of employment to Plaintiff.

102.    Plaintiff has filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission raising administrative claims of disability discrimination under 42 U.S.C. § 12112, retaliation under 42 U.S.C. § 12203(a), and interference under 42 U.S.C. 12203(b). Upon the issuance of a Right-to-Sue letter from the EEOC, Plaintiff intends to amend this Complaint to include causes of action for unlawful disability discrimination pursuant to 42 U.S.C. § 12112, retaliation pursuant to 42 U.S.C. § 12203(a), and interference pursuant to 42 U.S.C. § 12203(b) as soon as is practicable.

## CAUSES OF ACTION

### COUNT I: UNLAWFUL DISABILITY DISCRIMINATION VIOLATION OF KRS 344.040

103.    Plaintiff hereby incorporates each and every allegation of the preceding paragraphs as if fully set forth with particularity herein.

104.    Plaintiff is an employee pursuant to the definition set forth in KRS 344.030(5)(a).

105. Defendant BOE, as the governing body responsible for the management and control of WCPS pursuant to KRS 160.160, is an employer as that is defined under KRS 344.030(2).

106. Plaintiff's conditions of degenerative disc disease and persistent depressive disorder constitute disabilities pursuant to the definition set forth in KRS 334.010(4)(a). Plaintiff's DDD condition substantially limits his major life activities of walking, standing, and lifting, and as his persistent depressive disorder substantially limits his major life activities of concentrating, thinking, and communicating.

107. Accordingly, Plaintiff is a qualified individual with a disability pursuant to the definition set forth in KRS 344.030(1), as he can objectively perform the essential functions of the driver and driver trainer positions with or without reasonable accommodation.

108. Defendant BOE has, and at all times relevant hereto has had, knowledge of Plaintiff's disabilities, as he has regularly requested reasonable accommodation from and opposed discriminatory treatment by various BOE agents to whom the Board's knowledge may be properly imputed, including but not limited to Williams, Driver, Stewart, Jenkins, and Francis.

109. Plaintiff has requested reasonable accommodation for his DDD condition on multiple occasions from WCPS, and on each of these occasions, WCPS unlawfully denied his request. WCPS did not engage in good faith in any interactive process to determine whether it could grant the accommodations requested by Plaintiff, nor did it conduct any bona fide undue hardship analysis prior to denying his accommodation requests.

110. WCPS has furthermore failed to faithfully enforce Kentucky's disability-accessible parking laws, allowing non-disabled DOT staff to illegally park in the accessible-designated spaces in DOT lots without remedy or penalty. Consequently,

Plaintiff has been routinely denied state-mandated parking accommodations to which he is entitled.

111.    The above discriminatory actions taken by WCPS and its agents against Plaintiff would be considered materially adverse by a reasonable person.

112.    WCPS's adverse actions against Plaintiff were motivated either entirely or substantially by Plaintiff's disabilities.

113.    Defendant BOE, as the governing body responsible for the management and control of WCPS, has thus committed against Plaintiff the unlawful practice of discrimination against an individual on the basis of a disability, a violation of KRS 344.040.

## COUNT II: UNLAWFUL RETALIATION
## VIOLATION OF KRS 344.280

114.    Plaintiff hereby incorporates each and every allegation of the preceding paragraphs as if fully set forth with particularity herein.

115.    Plaintiff engaged in protected activity under KRS Chapter 344 on numerous occasions during the course of his employment, including but not limited to: his requests for reasonable accommodation of his disability; his complaints of disparate treatment on the basis of his disability to Williams, Driver, Jenkins, Stewart, and Francis; and his complaints of retaliation for protected activity to Jenkins, Stewart, and Francis.

116.    Defendants BOE, Jenkins, and Francis all had knowledge of Plaintiff's protected activities, as all of his complaints were either registered directly to BOE executive-level agents Jenkins and Francis or were escalated to those individuals by other WCPS employees.

117. As a result of Plaintiff's protected activity, Defendants took a number of adverse employment actions against Plaintiff, including but not limited to: WCPS's continued denial of reasonable accommodations requested by Plaintiff; removing Plaintiff from the workforce entirely; refusing to provide Plaintiff with reasonable criteria for returning to work; refusing to permit Plaintiff to attend his required in-service training updates; rescinding an offer of employment in the driver trainer position; and imposing unnecessary consecutive FMLA leave on Plaintiff he did not require.

118. A reasonable employee in Plaintiff's position would have found the actions of Defendants to be materially adverse and likely to dissuade the employee from making or supporting a charge of discrimination.

119. A causal connection exists between Defendants' adverse actions against Plaintiff and Plaintiff's protected activities.

120. Defendants have committed against Plaintiff the unlawful practice of retaliation in violation of KRS 344.280.

## COUNT III: UNLAWFUL REPRISAL
## VIOLATION OF KRS 61.102

121. Plaintiff hereby incorporates each and every allegation of the preceding paragraphs as if fully set forth with particularity herein.

122. Plaintiff is an employee pursuant to the definition set forth in KRS 61.101(1).

123. Defendant BOE, as the governing body responsible for the management and control of WCPS, is an employer pursuant to the definition set forth in KRS 61.101(2).

124. On March 30, 2023, pursuant to KRS 61.102(1), Plaintiff did report and disclose to WCPS "facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of

the United States, the Commonwealth of Kentucky, or any of its political subdivisions[.]" Specifically, Plaintiff reported to Francis and Stewart violations of Kentucky administrative regulations governing pupil transportation and bus driver qualifications that had been committed by Jenkins, as well as violations of Kentucky's disability-accessible parking laws under KRS 189.459(2) and Bowling Green's disability-accessible parking ordinances under Section 22-4.03(m) of the Bowling Green Code of Ordinances.

125. Plaintiff's aforementioned disclosures also constituted "Facts or information relative to actual or suspected mismanagement, waste, fraud, [or] abuse of authority" under KRS 61.102(1).

126. On April 7, 2023—only eight days following Plaintiff's protected disclosures to Francis and Stewart—WCPS denied Plaintiff's requested disability accommodations and prohibited him from returning to work.

127. On April 13, 2023—only two weeks following Plaintiff's protected disclosures—WCPS again denied Plaintiff's requested disability accommodations despite Plaintiff having obtained revised lifting restrictions above the maximum requirement for the bus driver position. WCPS further falsely informed Plaintiff that he could have no restriction on lifting at all under Kentucky law.

128. On April 24, 2023—less than one month following Plaintiff's protected disclosures—Jenkins and the DOT rescinded the driver trainer employment offer previously extended to Plaintiff, using his lifting restrictions again as a pretext for the adverse act.

129. On May 10, 2023—approximately five weeks following Plaintiff's protected disclosures—WCPS threatened to terminate Plaintiff for not reporting to work, despite WCPS itself having placed Plaintiff off-work involuntarily and indefinitely.

130. On May 25, 2023—a little under two months following Plaintiff's protected disclosures—WCPS prohibited Plaintiff from attending the mandatory in-service training update necessary for his recertification and employment in the upcoming 2023-24 school year.

131. Pursuant to KRS 61.103(1)(b), the WCPS officials taking the aforementioned adverse actions knew or had constructive knowledge of Plaintiff's protected disclosures and acted within a limited period of time following Plaintiff's disclosures, demonstrating Plaintiff's disclosures were a contributing factor to the adverse actions taken against him.

132. Defendant BOE has committed against Plaintiff the unlawful act of reprisal in violation of KRS 61.102(1).

### COUNT IV: UNLAWFUL INTERFERENCE
### VIOLATION OF 29 U.S.C. § 2615(a)(1)

133. Plaintiff hereby incorporates each and every allegation of the preceding paragraphs as if fully set forth with particularity herein.

134. Plaintiff is an employee pursuant to the definition set forth in 29 U.S.C. § 2611(3).

135. Defendant BOE is an employer pursuant to the definition set forth in 29 U.S.C. § 2611(4)(A)(1), having employed 50 or more individuals for each working day during 20 or more weeks in the current or preceding calendar year.

136. Plaintiff attempted to exercise his rights under the FMLA to intermittent medical leave when he and Dr. Singer sought such leave following Plaintiff's involuntary removal from the workforce by WCPS on the basis of his disability-related lifting restriction. Plaintiff sought intermittent leave because, per Dr. Singer's determination, his DDD condition may involve flare-ups or scheduled treatment that might require his absence once or twice each week, qualifying him for the leave he

sought pursuant to 29 U.S.C. § 2612(a)(1)(D). Plaintiff further sought intermittent leave so that he could continue to work his driver trainer position when such work was available, while also protecting his employment as a bus driver from termination premised on bogus absenteeism charges from WCPS.

137. Plaintiff met all eligibility requirements for FMLA leave pursuant to 29 U.S.C. § 2611(2)(A), having been employed by WCPS for over twelve months and having worked more than 1,250 hours during the 12 months preceding the commencement of his leave.

138. WCPS denied Plaintiff the intermittent FMLA leave which he and his physician requested, and instead placed him on several weeks of consecutive FMLA leave—far beyond what Dr. Singer determined was medically required for Plaintiff's DDD symptoms and treatment.

139. WCPS further denied Plaintiff his right to return to work from FMLA leave pursuant to 29 U.S.C. § 2614, when it prevented him from attending his mandatory annual in-service training update for the specific reason that he was "on FMLA," and when it prohibited him from returning to work at the conclusion of his improper consecutive leave.

140. By improperly imposing consecutive leave on Plaintiff, WCPS forced Plaintiff to prematurely exhaust his FMLA leave entitlement, thereby providing WCPS with a pretextual justification for disregarding Plaintiff's employment and benefits rights under the FMLA.

141. Defendant BOE unlawfully interfered with Plaintiff's rights under the FMLA in violation of 29 U.S.C. § 2615(A)(1). Defendant BOE's actions were knowing, willful, and in clear violation of the FMLA.

## **PRAYER FOR RELIEF**

142. As a direct and proximate cause of Defendants' actions recited herein, Plaintiff has suffered a loss of income and benefits, emotional distress, embarrassment, humiliation, and mental anxiety, for all of which he must be compensated.

143. WHEREFORE, Plaintiff prays that this honorable Court:

(a) Declare the Defendants' conduct to be in violation of Plaintiff's rights;

(b) Award Plaintiff any and all actual damages suffered for his lost wages and benefits, humiliation, embarrassment, personal indignity, apprehension over future income, emotional distress, and mental anguish, in such amounts to be proven at the trial of this matter;

(c) Award Plaintiff any and all compensatory, consequential, economic and non-economic damages suffered, in such amounts to be proven at the trial of this matter;

(d) Award Plaintiff equitable relief in the form of reinstatement, or if such remedy is not tenable, award Plaintiff front pay for his future lost wages;

(e) Award Plaintiff punitive damages pursuant to KRS 61.103(2) and KRS 61.990(4);

(f) Award Plaintiff liquidated damages pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

(g) Award Plaintiff costs, interest, and attorney's fees pursuant to KRS 344.450 and KRS 61.990(4), and 29 U.S.C. §§ 2617(a)(1)(A)(ii) and 2617(a)(3); and

(h) Grant Plaintiff such further legal and equitable relief as this Court may deem just and proper.

## JURY DEMAND

144. Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

/s/ Soha T. Saiyed
Soha T. Saiyed
Kelly M. Parry-Johnson
Reece Saiyed Parry-Johnson LLP
214 South Clay Street
Louisville, Kentucky 40202
T: 502-230-3239
E: sts@rspjlaw.com
E: kmpj@rspjlaw.com
*Counsel for Plaintiff*

## VERIFICATION

I, PAUL STIGERS, verify that the foregoing allegations are true to the best of my knowledge and belief.

Paul Stigers

COMMONWEALTH OF KENTUCKY )
                                                        )
COUNTY OF Warren                       )

Subscribed and sworn to before me by Paul Stigers this the 26 day of September, 2023.

My Commission Expires: 7/21/27

NOTARY PUBLIC
STATE AT LARGE, KENTUCKY

39